**AFFIDAVIT OF SPECIAL AGENT MICHAEL BORDINI IN SUPPORT OF COMPLAINT AND AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Bordini, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed for approximately one year.  I am currently assigned to the Boston Office of the FBI, in the criminal cyber squad.

2.      My duties include investigating criminal computer system intrusions, and I have received specialized training in cyber investigative techniques.  I have participated in the execution of warrants involving the search and seizure of computers, computer equipment, software, and electronically stored information.

3.      Prior to my employment with the FBI, I spent roughly eight years in a variety of technical positions, primarily serving as a cyber-security consultant.  As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is being submitted in support of a criminal complaint against Colby Anderson ("Anderson"), a resident of Brockton, Massachusetts, charging him in connection with the August 2018 computer intrusion of a Massachusetts company, Sedtech Solutions, Inc. (doing business as "Blueport Wireless"), in violation of 18 U.S.C. § 1030(a)(5)(A).

5.      This affidavit is also being submitted in support of an application for a warrant to search Anderson's residence, which consists of the basement level living area, and first floor common living areas (including the kitchen and bathrooms) within the single family home located at 93 Guild Road, Brockton, Massachusetts 02302, as further described in Attachment A

1

(the "Subject Premises").  There is probable cause to believe both that Anderson committed the federal offense listed above, and that the Subject Premises contains evidence, fruits, and instrumentalities of that offense, as described in Attachment B.

6.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. Among other things, I participated in interviews of employees at Blueport Wireless and reviewed materials provided by Blueport Wireless to law enforcement, including computer system logs, email communications, and personnel file records.

7.      This affidavit does not set forth all the facts developed during the course of this investigation and does not set forth all of my knowledge about this matter.  This affidavit is intended to show merely that there is probable cause to believe that Anderson has committed the above-described offense and that evidence, fruits, and instrumentalities of this offense will be found at the Subject Premises.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

8.      Blueport Wireless is a high speed internet access provider based in Foxborough, Massachusetts.  It services customers in the hospitality industry, including top hotel chains nationwide.

9.      Blueport Wireless has a contract with Portland, Oregon-based Eleven Software, Inc. for a service referred to as "ElevenOS."  This service is cloud based and it provides authentication, network configuration, and management capabilities that Blueport Wireless leverages to service its customers.  Select Blueport Wireless employees have login credentials (including a username and a password) that can be used to access Blueport Wireless's ElevenOS portal from a public-facing website.  After logging into the portal, Blueport Wireless employees

can make changes to customer's network configurations.

10.     Blueport Wireless also runs a software package called PRTG Network Monitor ("PRTG"), a subscription-based system used to monitor, store, and analyze data from customer networks.  As with ElevenOS, select Blueport Wireless employees have login credentials to access the PRTG system from a public-facing website.

11.     In August 2017, Anderson began working as an hourly technician at Blueport Wireless.  In January of 2018, he was promoted to the position of Network Operations Center Technician.  As a Network Operations Center Technician, Anderson was responsible for handling customer tickets that escalated beyond initial troubleshooting, proactively monitoring equipment, performing updates and configuration changes, and maintaining equipment documentation.

12.     Anderson was issued ElevenOS and PRTG login credentials in connection with his employment.

13.     On July 11, 2018, Anderson was terminated for misconduct after he was caught smoking inside the Blueport Wireless facilities in Foxborough.  Blueport Wireless executives described Anderson as visibly upset throughout the termination process.  Anderson's ElevenOS and PRTG login credentials were disabled contemporaneously with his termination.

14.     On the morning of August 2, 2018, Blueport Wireless began receiving customer complaints that their high speed internet access was unavailable.  Blueport Wireless attempted to troubleshoot the issue and determined that the configuration profiles for the affected customers were deleted via ElevenOS, causing internet access outages at the customers' facilities.

15.     Upon further investigation, Blueport Wireless executives determined that over a span of approximately four hours on August 2, 2018, the configuration profiles for between 100

and 120 customers were deleted.

16.     Specifically, on August 2, 2018, the username and password issued to a Blueport Wireless employee ("Account 1") was used to log into the ElevenOS service and delete configuration profiles for customers.  Account 1 was also utilized to change the status of Anderson's former ElevenOS account from "disabled" to "removed" and six employee's ElevenOS accounts from "active" to "disabled."  Michael Volpe, the employee assigned to Account 1, informed law enforcement officers that he did not log into the ElevenOS service and delete customer configuration profiles or modify employee accounts, nor did he authorize anyone to do so on his behalf.  He also stated he did not change the default password for his account.

17.     Representatives from Eleven Software, Inc. reviewed Blueport Wireless's system logs for August 2, 2018 and determined that the individual who logged in through Account 1 and deleted the configuration profiles and modified employee accounts did so from IP address 65.96.19.197.

18.     The username and password of a second Blueport Wireless employee (Account 2) were also used on August 2, 2018, to log in to the PRTG system and delete customer monitoring data.  Lori Conrad, the employee assigned to Account 2, stated that she did not log in to the PRTG system and delete customer monitoring data, nor did she instruct anyone else to do so on her behalf.  She also stated that she had not changed the default password for her PRTG account.

19.     Representatives from Blueport Wireless reviewed system logs for August 2, 2018, and determined that the individual who logged in with Account 2 and deleted the customer monitoring data connected to the PRTG system from the same IP address, 65.96.19.197.

20.     According to Blueport Wireless, over $50,000 was spent on around the clock

4

employee labor in an attempt to rectify the issues caused by the changes to the customer's

ElevenOS and PRTG accounts and the resulting wireless outages.

21.     On August 9, 2018, Blueport Wireless reported the August 2, 2018 unauthorized

access and damage to the Foxborough Police Department ("FPD").  Through open source tools,

FPD determined that the IP address at issue, 65.96.19.197, was owned by Comcast Cable

Communications, LLC ("Comcast").

22.     Comcast subscriber records establish that on August 2, 2018, the IP address

65.96.19.197 was assigned to Comcast subscriber Joseph Muller for high speed internet service

at 93 Guild Rd, Brockton, MA 02302-2947—the single family home that contains the Subject

Premises.

### THE PREMISES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES

23.     I also have probable cause to believe that Subject Premises contains fruits,

evidence, and instrumentalities of violations of 18 U.S.C. § 1030(a)(5), as described in

Attachment B.

24.     From August 29, 2018 through September 18, 2018, and October 5, 2018 through

October 10, 2018,  Brockton Police officers and the FBI conducted surveillance at the Subject

Premises.

25.     A white Toyota Corolla bearing Massachusetts registration 3GZ425 was observed

on multiple occasions parked in the immediate vicinity of the Subject Premises.  According to

the Massachusetts Registry of Vehicles, Anderson is the registered owner of the vehicle.

26.     On September 18, 2018, after observing the aforementioned vehicle parked in the

immediate vicinity, officers approached the Subject Premises and knocked on the front door.

Anderson came from the back of the house (via the separate basement entrance) and told the

officers that he rented a room in the basement of the Subject Premises and stated that there were also other people who also rented rooms in the house.

27.     Public database checks identify Joseph Muller as the owner of 93 Guild Road in Brockton, which contains the Subject Premises and is zoned as a single family three-bedroom home.  The Subject Premises has a single mailbox, signifying that there are no individualized units within the home.  Public database checks similarly do not indicate that there are multiple units within the Subject Premises.  They also demonstrate that Anderson has inhabited the Subject Premises since August of 2018.

28.     I am unaware of any other individual employed by Blueport Wireless living at the Subject Premises during the relevant time period.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

29.     There is probable cause to believe that electronic equipment was used to violate federal law, and that the equipment will be found at the premises set forth in Attachment A.

          a.     From my training and experience, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

          b.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small

6

computers.  Apple iPhones, such as Anderson's phone, are a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, accessing the internet through web browsers, social media platforms, and various other applications, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

c.      As set forth *supra*, the IP address 65.96.19.197 was used to delete Blueport Wireless customer profiles and modify employee accounts on ElevenOS and to delete customer configurations in the PRTG system.  That Comcast IP address belongs to subscriber Joseph Muller, who owns the home located at 93 Guild Road, Brockton, MA 02302, where Anderson, a former employee of Blueport Wireless, also resides.

d.      There is therefore probable cause to believe that computer equipment capable of accessing the internet was used at 93 Guild Road, Brockton, MA 02302 in connection with the Target Offense.

30.      Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their

7

computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

31.    Based on my knowledge and training, I am aware that in order to completely and

accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.     The volume of evidence—storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.     Technical requirements—analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden,"

deleted, compressed, or encrypted files.  Many commercial computer software

programs also save data in unique formats that are not conducive to standard data

searches.  Additionally, computer evidence is extremely vulnerable to tampering

or destruction, both from external sources and destructive code imbedded in the

system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or

seize the computer equipment for subsequent processing elsewhere.

32.     The premises may contain computer equipment whose use in the crime or storage

of the things described in this warrant is impractical to determine at the scene.  Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the premises during the execution of this warrant.  If the things described in

Attachment B are of the type that might be found on any of the computer equipment, this

application seeks permission to search and seize it onsite or off-site in order to determine their

true use or contents, regardless of how the contents or ownership appear or are described by

people at the scene of the search.

33.     It is likely that the Subject Premises will contain at least one Apple iPhone

belonging to Anderson.  Blueport Wireless employees stated that he has an iPhone and has

previously brought it to work.

34.     I know from my training and experience, as well as from information found in

publicly available materials including those published by Apple, that some models of Apple

devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of

a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

35.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

36.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

37.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  I know that in some cases it may not be possible to know with certainty who is the user

of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require Anderson to press his finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the Subject Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

38.     For these reasons, I request that the Court authorize law enforcement to press Anderson's fingers to the iPhone for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## **CONCLUSION**

39.     Based on the information described above, I have probable cause to believe that that Anderson has violated 18 U.S.C. § 1030(a)(5)(A) and that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the premises described in Attachment A.

Sworn to under the pains and penalties of perjury,

_____
Michael Bordini
Special Agent, FBI

Subscribed and sworn to before me on October____, 2018.
10

_____
United States Magistrate Judge Page Kelley

## ATTACHMENT A

### DESCRIPTION OF THE PREMISES TO BE SEARCHED

The premises to be searched are located within 93 Guild Road, Brockton, Massachusetts 02302, which is a three-bedroom 1404 square foot single family ranch style residence, off-white in color with maroon shutters.  The front door is white and is protected by a glass storm door. The number "93" is clearly marked in dark lettering next to the front door.  Within the structure, the premises to be searched include the basement and all areas of the first floor, with the exception of the three bedrooms.  The photos below accurately depict the exterior of the premises to be searched.







**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.        All records, in whatever form, and tangible objects that constitute evidence, fruits,

or instrumentalities of violations of 18 U.S.C. § 1030(a)(5)(A), including:

        A.        Records and tangible objects pertaining to the following people, entities,

                physical addresses, and IP addresses:

                1.        Colby Anderson

                2.        93 Guild Road, Brockton, Massachusetts 02302

                3.        65.96.19.197 (IP address)

                4.        Blueport Wireless

                5.        Sedtech Solutions, Inc.

                6.        ElevenOS

                7.        Eleven Software, Inc.

                8.        PRTG Network Monitor

                9.        Lori Conrad

                10.        Michael Volpe

        B.        For any computer hardware, computer software, mobile phones, or storage

                media called for by this warrant or that might contain things otherwise

                called for by this warrant ("the computer equipment"):

                1.        evidence of who used, owned, or controlled the computer

                      equipment;

                2.        evidence of the presence or absence of malicious software that

would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

3.      evidence of the attachment of other computer hardware or storage media;

4.      evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.      evidence of when the computer equipment was used;

6.      passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.      records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

C.      Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.      All computer hardware, computer software, and storage media.  Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of Anderson to the Touch ID sensor of the iPhone for the purpose of attempting to unlock the device(s) via Touch ID in order to search the contents as authorized by this warrant.

## DEFINITIONS

For the purpose of this warrant:

A.    "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or

memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     A "record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes